No. 14286

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

IN THE MATTER OF DECLARING
T.E.R. Youth in Need of Care.

---

Appeal from:  District Court of the  Tenth Judicial District,
              Honorable LeRoy L. McKinnon, Judge presiding.

Counsel of Record:

    For Appellant:

        William F. Berger argued, Lewistown, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        William Spoja, Jr., County Attorney, Lewistown, Montana
        Timothy O'Hare, Deputy County Attorney, argued, Lewistown,
         Montana
        K. Robert Foster argued, Lewistown, Montana

---

                              Submitted:  November 21, 1978

                                Decided:  FEB 14 1979

Filed:  FEB 14 1979

*Thomas J. Kearney*
                                    Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal by the parents of a minor child from a judgment and order entered October 17, 1977, in the Youth Court of the Tenth Judicial District, Fergus County, the Honorable LeRoy L. McKinnon presiding. The judgment declared T.E.R. to be a Youth in Need of Care and awarded permanent custody of T.E.R. to the Department of Social and Rehabilitation Services of the State of Montana (SRS) with authority to consent to her adoption.

On October 29, 1975, James Longin, the principal at T.E.R.'s school, notified Roberta Knopp, a child welfare caseworker, that T.E.R. might be the victim of child abuse. Subsequent to her investigation, Ms. Knopp offered "protective services" which consisted of regular visits to the child's home. Over the course of the next year and a half, she maintained contact with T.E.R., noticing, on occasion, a number of bruises which she suspected to be the result of some abuse.

Among other things, testimony indicated that T.E.R. is bright for her age but not well adjusted. In February 1977, shortly before her twelfth birthday and while attending the fourth grade, she exhibited this poor adjustment by damaging two ceiling tiles in a restroom at her school. The school's principal, who had been working with T.E.R. and her parents periodically for two years, wrote her parents detailing the incident and suggested certain changes in their treatment of T.E.R.

A few weeks after this incident, Ms. Knopp placed T.E.R. in 24 hour day care because her stepfather had been hospitalized and her mother was working outside the home at

a job which required her presence 24 hours each day. After a month had passed under this arrangement, Ms. Knopp told T.E.R. that she would be taking her back home shortly. T.E.R. reacted to this suggestion with some alarm and, after some prodding, told Ms. Knopp of recent incidents of sexual abuse by her stepfather. The incidents had allegedly increased in frequency since her mother had taken the job which kept her away from the family home.

On Monday, April 15, 1977, two days after their talk, Ms. Knopp took T.E.R. to a doctor who performed a pelvic examination. The doctor told Ms. Knopp that there was evidence of sexual contact and Ms. Knopp immediately placed T.E.R. in a foster home in Harlowton, Montana. One week later, on Monday, April 22, 1977, the deputy county attorney for Fergus County, filed a petition for youth hearing, alleging that T.E.R. was a youth in need of supervision because of the February incident at school and because she was "habitually disobedient and beyond parental control". On May 4, 1977, a hearing was held at which T.E.R. was represented by an attorney, the State was represented by the deputy county attorney, and T.E.R.'s parents represented themselves. On motion of the attorney representing the child, the petition was orally amended to include allegations that T.E.R. was a youth in need of care. T.E.R. gave her statement in chambers, outside the presence of her parents. While she was testifying, her stepfather apparently suffered a heart attack and was taken to the hospital. At that time, the deputy county attorney moved that the hearing be continued until the State could file an amended petition inserting the charge that T.E.R. was a youth in need of care and have the amended petitions served on all parties. This was done on June 2, 1977.

Subsequent hearings, on July 7 and August 4, primarily addressed allegations of physical and sexual abuse by T.E.R.'s stepfather. T.E.R.'s stepfather denied these allegations and, through his attorney, attempted to prove that T.E.R. had a reputation for untruthfulness and that if she had been sexually active, it would have been with neighborhood boys.

On appeal the parents present four issues for our consideration. They can be summarized and stated as follows:

1. Whether the Youth Court erred in allowing the child to testify outside the presence of her parents as to the alleged sexual and physical abuse by her stepfather.

2. Whether the Youth Court abused its discretion in making a finding of sexual abuse based primarily on the child's disputed testimony.

3. Whether the Youth Court erred by considering T.E.R.'s report cards, submitted subsequent to the hearing by the Department of Social and Rehabilitation Services.

4. Whether the State followed proper procedures in taking T.E.R. into custody and maintaining custody pending the Youth Court's ultimate determination on the petition alleging her to be a youth in need of care.

T.E.R. testified on two occasions; both times she was permitted to testify outside the presence of her parents. On the first occasion, at the May 4 hearing, she was questioned by the attorney appointed to represent her and by the deputy county attorney. It was while this testimony was being given that T.E.R.'s stepfather suffered a heart attack in the courtroom where he was waiting with T.E.R.'s mother. The second time T.E.R. was questioned was at the July 7 hearing. On that occasion the attorney for the parents was given the opportunity to cross-examine.

The parents argue that the allegations made by T.E.R. in the course of her testimony amounted to charging her stepfather with criminal conduct and that he was therefore constitutionally entitled to confront his accuser. We do not agree. At the outset it should be noted that a "petition alleging abuse, neglect, or dependency is a civil action brought in the name of the state of Montana. . ." Section 10-1310(3), R.C.M. 1947, now section 41-3-401(3) MCA. The overriding policy which underlies all actions involving potentially abused children is "to provide for the protection of children whose health and welfare are adversely affected and further threatened by the conduct of those responsible for their care and protection." Section 10-1303, R.C.M. 1947, now section 41-3-101(2) MCA. Under circumstances such as those presented in the instant case, it may be necessary for a child's testimony to be taken outside the presence of "those responsible for their care and protection." We therefore hold that a child may testify outside the presence of his parents in a case involving allegations of abuse and neglect, subject to cross-examination by the parents' attorney, when the presiding judge determines that it is the most likely method of discovering the whole truth as to the alleged abuse or neglect.

The next issue presented refers to the court's Finding of Fact No. 12:

> "12. That the step-father has fondled the said youth, and has attempted to have sexual relations with her on many occasions when the mother was not in the home."

The parents argue that the judge erred in making such a finding in light of testimony adduced at the hearing that T.E.R. has lied at times to avoid punishment and that she does not wish to live with her stepfather. However, our

review of the testimony does not reveal that the Youth Court clearly abused its discretion in arriving at this determination. Where testimony is directly conflicting we presume that the judge's findings are correct because he was present when the testimony was given and had the opportunity to observe the demeanor of the witnesses. Hellickson v. Barrett Mobile Home Transp. (1973), 161 Mont. 455, 460, 507 P.2d 523, 526. As a result, we do not find that the Youth Court abused its discretion in making a finding of sexual abuse based primarily on the child's disputed testimony.

The parents' third issue concerns T.E.R.'s school report card which was submitted to the judge for his consideration some time after the conclusion of the August 4 hearing. In fact he did not receive the report card until sometime in October. As evidence, the report card falls within Rule 803(6), Mont.R.Evid., which excepts records of regularly conducted activity from the hearsay prohibition. The fact that the report card was brought to the judge's attention after the conclusion of the hearing is somewhat disturbing but does not amount to reversible error. First, the report card was not in existence at the time the hearing concluded. Second, the best interests of the child require some degree of flexibility in procedure to insure that all evidence pertaining to the best interests of the child may be considered. In addition, counsel for the parents knew of this report card and has never questioned its authenticity. We find under the circumstances of the instant case that the Youth Court did not err in considering T.E.R.'s report card.

The final issue raised by the parents concerns the procedure by which T.E.R. was taken from her home by Ms.

Knopp, the caseworker from SRS. What did not appear from the record as it was submitted to this Court, but what has been made a part of the record pursuant to stipulation of the parties during oral argument, is that a proceeding was held on April 20, 1977. At that time T.E.R.'s mother agreed to the shelter care arrangement proposed by Ms. Knopp, to be implemented pending determination of this matter by the Youth Court. Thus, to prevent any possible embarrassment to T.E.R.'s parents, the parties then proceeded pursuant to the statutory provisions regarding youths in need of supervision rather than youths in need of care. Initially, this had the effect of establishing for the stepfather a prima facie showing of denial of due process. At the May 4 hearing, he had only received notice that allegations had been made that T.E.R. was a youth in need of supervision. The true concern of the parties, however, was that T.E.R. might be a youth in need of care because of sexual abuse. Had the stepfather not suffered a heart attack during that hearing, the State may not have had an opportunity to cure the alleged defects with respect to due process prior to a final determination by the Youth Court. But subsequent to that hearing, the stepfather had been apprised of the true nature of the allegations involved in the case. He was given the opportunity to testify, and he was represented by counsel. In addition, he was able through his counsel to cross-examine T.E.R. with respect to her allegations. Therefore, though the procedures involved in this case were highly unusual and not condoned by this Court, we find that T.E.R.'s stepfather was ultimately afforded due process.

Beyond that, however, something more stands out. These proceedings focused primarily on allegations of improper conduct on the part of the stepfather. These allegations were found to be supported by a preponderance of the evidence, and the Youth Court was therefore correct in finding T.E.R.'s stepfather to be "an unfit person to have custody; that by reason of his dominance in the family the youth is unable to avoid his abuse."

However, a careful review of the record does not reveal that the Youth Court adequately considered the rights of T.E.R.'s mother in awarding permanent custody of T.E.R. to SRS with authority to consent to her adoption. In addition to their rights as a couple, parents may have individual rights with respect to their children. The record in the instant case reveals that the mother's rights were afforded no more than superficial consideration. Therefore, the order of the Youth Court is vacated to the extent that it applies to T.E.R.'s mother, and the case is remanded to the Youth Court for further proceedings to determine the future status of the mother's parental rights.

                                        _____
                                                    Justice

We concur:

_____
          Chief Justice

_____

_____

_____
          Justices

-8-