No. 14688

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

IN THE MATTER OF L.F.G.,
Youth in Need of Care.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Robert L. Stephens, Jr. and David Kinnard, Billings,
Montana
David Kinnard argued, Billings, Montana

For Respondent:

Harold Hanser, County Attorney, Billings, Montana
Robert Waller argued, Deputy County Attorney,
Billings, Montana
Damon L. Gannett argued, Billings, Montana

---

Submitted: June 15, 1979
Decided: AUG 2 0 1979

Filed:
AUG 2 0 1979

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal arises from a custodial hearing held on September 29, 1978, in the District Court of the Thirteenth Judicial District, State of Montana, in and for the County of Yellowstone, the Honorable Robert H. Wilson presiding. The case was tried on the petition of the Department of Social and Rehabilitation Services of the State of Montana (SRS) to have L.F.G. declared to be a youth in need of care and to have his permanent care, custody and control awarded to the State of Montana, with authority to consent to adoption. The Yellowstone County attorney's office appeared and participated as counsel for SRS. The natural parents were present at the hearing and were represented by counsel, and a previously appointed guardian ad litem for the youth appeared and participated in the hearing as the representative of the child.

Upon completion of the hearing, the matter was taken under advisement by the trial court. It entered findings of fact, conclusions of law and order on October 16, 1978, granting the relief requested by SRS. Judgment was subsequently entered in accordance therewith on October 17, 1978. The parents of the youth appeal.

L.F.G. was born on September 29, 1977, in Billings, Montana. The natural parents of the child are J.C.G. and R.G. At the time of the hearing, the natural parents and the child resided in Yellowstone County, Montana.

The social worker in the case, Martha Everett, had her first contact with the mother on September 19, 1977, when she and her mother contacted the local SRS office to learn the procedures relative to the relinquishment of the mother's

-2-

then unborn child. The mother indicated to Everett during their initial contact that she did not feel that "she was strong enough to take care of a baby."

The child was born ten days after the mother's initial contact with the social worker. At birth, the baby weighed four pounds and eleven ounces. He was normal in all respects, except that his birth weight was light for a full-term infant.

On October 3, 1977, the mother informed Everett that she had changed her mind about relinquishing the child, and that she no longer was interested in having the child placed adoptively. The baby was placed in a foster home on October 5, 1977, with the knowledge, understanding, and consent of the child's natural parents. At the time of placement in foster care, the mother indicated that "she didn't feel that she was physically ready for taking care of the child." Mrs. Delores Smith was the foster parent who provided the primary care for the baby during his residence in her foster home.

The baby remained in the Smith foster home from October 5, 1977, until April 10, 1978. During that six-month period, the mother made 38 visits to the foster home to visit her child. The purpose of the mother's visits with her child in the foster home was to allow her visitation, to observe her with the child, and to attempt to teach her the skills she would need to care for the child on his return to her physical custody. Mrs. Smith was present during each of the visits that the mother had with her child. During this six-month period of foster care, the father made one visit to see the child in the Smith home.

The mother showed some improvement in her apparent ability to care for the child during the period of January to March 1978. Mrs. Smith indicated, however, that she never really held the baby properly, and that she failed to demonstrate any affection or emotion towards the child. The baby seemed to cry more than usual when he was around his mother, and the mother appeared to be confused and uncertain about what to do with the child in general.

Mrs. Smith never observed any physical contact or interaction between the child and his father during the initial period of foster care in her home.

The baby was returned to his natural parents on April 10, 1978. Prior to that return, Martha Everett had made arrangements for the provision of many support services to assist the mother in her care of the child. Homemakers from SRS and a public health nurse made regular and frequent visits to the child and his parents. Despite these efforts made to upgrade the mother's child-caring skills, she failed to learn the things that she was taught concerning her care of the child. There was also an absence of physical contact and play between the child and his mother. The public health nurse also observed the mother leave the baby unattended on two occasions. The mother also described the father as having thrown the child into the baby crib.

The child's situation with his natural parents began to deteriorate. According to the homemakers and public health nurses who were in the home, the mother became more distant and less cooperative. Finally, on May 18, 1978, based upon the observations of the service providers and the recommendation of a psychiatrist, Dr. Van Dyke, the child was removed from the home of his natural parents and returned to the

Smith foster home. At the time of the child's return to the foster home, his head was dirty, his body was dirty, and his "little penis was filthy." He was subsequently observed apparently having nightmares and waking up crying and shaking.

Evidence concerning the mother's psychological condition was presented at the hearing. The mother had been evaluated in November 1977 by Dr. Ned Tranel and again on March 21, 1978. Dr. Tranel diagnosed the mother as having two major psychological disorders. The first is technically classified as schizophrenic reaction, chronic undifferentiated type. The second disorder was described by Dr. Tranel as being an organic brain syndrome or chronic brain syndrome. Dr. Tranel offered the opinion that the child should not be returned to a situation in which the mother was the primary caretaker for the child.

The issues presented on appeal are:

1. Was the evidence presented at the custody hearing sufficient to support the finding of the District Court that L.F.G. was a youth in need of care within the meaning of section 41-3-102, MCA?

2. Did the District Court err in terminating the parental rights of R.G., the father, based upon the evidence presented?

3. Was L.F.G. a youth in need of care?

The function of a reviewing court in a case such as this one has been well defined in prior decisions of this Court. In Re Gore (1977), ____ Mont. ___, 570 P.2d 1110, 34 St.Rep. 1179, involved an appeal from a District Court determination similar to one in the instant case. In deciding that the District Court had not abused its discretion when it granted SRS's petition for permanent custody, this Court stated:

-5-

". . . This Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. Foss v. Leafer, ____ Mont. ____, 550 P.2d 1309, 33 St.Rep. 528 (1976). Due to this presumption of correctness the district court's findings will not be disturbed unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion . . ." 570 P.2d at 1112, 34 St.Rep. at 1181-1182.

The rule in Montana is that before the ruling of the District Court can be overturned, it must be shown that the District Court clearly abused its discretion.

For the District Court to find that L.F.G. was a youth in need of care, it had to find that he was dependent or suffering from abuse or neglect. Section 41-3-102(4), MCA. Section 41-3-102(2)(a) and (b), MCA, define abuse or neglect:

"(2) 'Abuse' or 'neglect' means:

"(a) the commission or omission of any act or acts which materially affect the normal physical or emotional development of a youth. Any excessive physical injury; sexual assault, or failure to thrive, taking into account the age and medical history of the youth, shall be presumed to be nonaccidental and to materially affect the normal development of the youth.

"(b) the commission or omission of any act or acts by any person in the status of parent, guardian, or custodian who thereby and by reason of physical or mental incapacity or other cause refuses or, with state and private aid and assistance, is unable to discharge the duties and responsibilities for proper and necessary subsistence, education, medical, or any other care necessary for the youth's physical, moral, and emotional well-being."

Appellants contend that under the facts of this case, there was a clear abuse of discretion on the part of the District Court in the entry of its findings.

Appellants argue that the Montana legislature has declared the policy of this state for abused and neglected children in section 41-3-101(1), MCA, which provides:

"(1) It is hereby declared to be the policy of the State of Montana to:

"(a) insure that all youth are afforded an adequate physical and emotional environment to promote normal development;

"(b) compel in proper cases the parent or guardian of a youth to perform the moral and legal duty owed to the youth;

"(c) achieve these purposes in a family environment whenever possible; and

"(d) preserve the unity and welfare of the family whenever possible."

Where a child has allegedly been abused or neglected by his natural parents, the State has a clear duty to protect the interests of the child by means of a judicial hearing to determine whether the youth is in fact abused or neglected. The importance of the nature and scope of this judicial proceeding has previously been addressed by this Court in a recent case, In the Matter of Guardianship of Doney (1977), _____ Mont. _____, 570 P.2d 575, 577, 34 St.Rep. 1107, 1109-10:

"There are, however, few invasions by the state into the privacy of the individual that are more extreme than that of depriving a natural parent of the custody of his children. For this reason, the legislature carefully enunciated the procedures the state must follow and the findings which the court must make before custody of a child may legally be taken from his natural parent.

". . .

"This careful protection of parental rights is not merely a matter of legislative grace, but is constitutionally required. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)."

The provisions mandated by the Montana legislature relative to required procedure and findings by the District Court in cases of alleged abuse or neglect are set forth in several pertinent statutes. Section 41-3-404, MCA, provides in pertinent part:

"(1) In a hearing on a petition under 41-3-401, the court shall determine whether said youth is an abused, neglected, or dependent child, and ascertain, as far as possible, the cause thereof." (Emphasis supplied.)

Section 41-3-406, MCA, then clearly states in part:

"(1) If a youth is found to be abused, neglected, or dependent, the court may enter its judgment making any of the following dispositions to protect the welfare of the youth:

". . .

"(b) Transfer legal custody to any of the following:

"(i) Department of Social and Rehabilitation Services."

Appellants argue that these statutes make it clear that a finding of abuse, neglect, or dependency is the jurisdictional prerequisite to any court ordered transfer of custody, citing In the Matter of Fish (1977), ____ Mont. ____, 569 P.2d 924, 927, 34 St.Rep. 1080; Gore, 570 P.2d at 1113, 34 St.Rep. at 1183; Doney, 570 P.2d 577, 34 St.Rep. at 1109-10. Appellants argue it is then, and only then, that the "best interests of the child" standard so well established by this Court has its application in the resolution of the question of custody. Gore, 570 P.2d at 1114, 34 St.Rep. at 1184; Doney, 570 P.2d at 578, 34 St.Rep. at 1110. Thus, before the District Court may consider what the "best interests of the child" may in fact be, the court must have found that the child in question was in fact abused or neglected pursuant to statutory definition in section 41-3-102(2), MCA. This element cannot be satisfied by a mere recitation of the District Court that it finds the child in question to be abused or neglected; the evidence submitted to the court must clearly support such a finding.

With this standard in mind, we have reviewed the evidence presented to the District Court as it fits into the general guidelines established by this Court in recent decisions regarding abused and neglected youths. The child here was placed in the family home for a period of only five weeks. During this time, the family was subject to the daily supervision of welfare department personnel. The public health nurse, the personnel of the welfare department, and a neighbor, all had the opportunity to observe the child in the parents' home, and all agreed that during their observations he appeared to be well-fed, well-clothed, and clean. In addition, during this period there were no signs of physical abuse, and the child appeared to have no learning disabilities or behavior problems in the home, nor was he left alone for extensive periods of time without supervision.

On the basis of the above facts, appellants endeavor to distinguish the facts in this case from the facts in several cases involving physical abuse and neglect of a child justifying the termination of parental custody.

In addition, appellants endeavor to distinguish the facts in this case from the facts in several cases in which the mental condition of one or both parents was a factor considered by the court together with other environmental factors justifying the termination of parental custody. In the Matter of T.E.R. (1979), ____ Mont. _____, 590 P.2d 1117, 36 St.Rep. 276; In the Matter of J.J.S. (1978), ____ Mont. ____, 577 P.2d 378, 35 St.Rep. 394; In re Moyer (1977), ____ Mont. _____, 567 P.2d 47, 34 St.Rep. 682; In re Matter of Bessette (1976), 170 Mont. 122, 551 P.2d 653; In re Henderson (1975), 168 Mont. 329, 542 P.2d 1204.

Appellants contend that a review of the evidence presented at the hearing presents the contrary view, i.e., that the child suffered no adverse effects from his mother's mental condition, and that he was in fact well cared for. This, they claim, is the distinguishing factor from the other Montana cases previously cited. The mental condition of the mother standing alone, according to appellants, was apparently found by the District Court to be the sole basis for termination of parental rights, without a finding of the relationship between the mental condition and any alleged detriment to the child.

A review of Montana case law reveals no decisions in which the mental condition of one or both parents was the sole factor considered by the court. Other jurisdictions, however, have considered this factor and some have arrived at a different conclusion than that reached by the District Court herein.

Appellants cite a minority view of Mr. Justice Murphy in a 1972 termination of parental rights case from New York. While we do not wish to disagree with our Irish brother in New York, we find that relying on a minority view in making our decision as to what the law is to be in this State, while enlightening, is not persuasive. The majority found that under the New York Family Court Act, Section 1012(f), that the record amply supported a finding of neglect in that the child is "in eminent danger of becoming impaired." The court noted that a child living with a chronic paranoid and severely psychotic schizophrenic mother is in eminent danger of becoming physically and emotionally impaired. That is the situation the trial judge faced here, and we do not find fault with his judgment.

-10-

Appellants go on to discuss several cases from other jurisdictions to substantiate their position on mental conditions as the sole factor in a case involving parental rights. See, In Interest of E. v. J.T. (1978), _____ Utah2d _____, 578 P.2d 831; In the Matter of Anderson (1978), 35 Or.App. 561, 582 P.2d 29; In the Matter of Wyatt (1978), 34 Or.App. 793, 579 P.2d 889; In the Matter of Fisher (1976), 169 Mont. 254, 545 P.2d 654; In the Matter of J.J.S., supra. As these cases discuss, one of the controlling criteria to be considered is, what are the possibilities of damage to the child? What we have before us here is a case not of possibilities, but of high probabilities, and in such a case, the child's future must be paramount. As we noted in In the Matter of J.J.S., 577 P.2d at 381, 35 St.Rep. at 397:

> ". . . What is, or what is not, the best interests
> of the child depends upon the facts and circum-
> stances of each case. The responsibility of de-
> ciding custody is a delicate one that is lodged
> in the District Court. The judge hearing oral
> testimony in such a controversy has a superior
> advantage in determining the same, and his deci-
> sion ought not to be disturbed except under a
> clear abuse of discretion. [Citations omitted.]"

Dr. Tranel testified that because of the mother's combination of a schizophrenic mental illness and organic brain damage, there existed a condition of material depri-vation known as "mask deprivation." This condition exists where there is no emotional responsiveness to the child, but this failure to "mother" the child is masked by the fact that the parent is physically present. He further testified that the mother would not be able to respond to the most basic emotional needs of the child because of her mental condition. Dr. Tranel stated that while it was possible that the mother's condition could be stabilized at its present level, it was unrealistic to expect any improvement.

Dr. Tranel concluded that if the child was returned to the mother, he would not receive even minimally satisfactory maternal care and would be exposed to "extremely high" chances of developing a mental condition similar to that of the mother.

We find there is sufficient credible evidence to support the decision of the District Court that the child was a youth in need of care. Therefore, there has been no abuse of discretion. In removing the child permanently from the natural parents, the District Court was acting in the best interests of the child as it was bound to do.

The District Court in this case had the opportunity to view the testimony of J.C.G., and was justified in finding that the child was a youth in need of care. It is in the best interests of the child that he not be returned to the natural parents but placed for adoption. The attorney for the youth supports the position of the District Court and the State on this issue.

Appellants next contend that in the trial of this matter R.G., the natural father, played an insignificant role in the evidence presented to the court regarding the capacity and capabilities of R.G. and J.C.G. as parents. This proceeding focused primarily on allegations of mental incapabilities on the part of the mother. During the proceedings, the father was mentioned only in passing on several occasions, and at no time during the proceedings was there any substantial effort made to inquire into his capabilities as a parent. Appellants contend that this lack of discussion requires a close examination of the validity of the termination proceedings in light of a recent decision made after the entry of judgment in the case here. In the

Matter of T.E.R. (1979), supra. In that case, the Court directed itself to exactly this issue for what was apparently the first time, and found an inadequate consideration of the rights of the other parent:

> "However, a careful review of the record does not reveal that the youth court adequately considered the rights of T.E.R.'s motion in awarding permanent custody of T.E.R. to SRS with authority to consent to her adoption. In addition to the rights as a couple, parents may have individual rights with respect to their children. The record in the instant case reveals that the mother's rights were afforded no more than superficial consideration. Therefore, the order of the youth court is vacated to the extent that it applies to T.E.R.'s mother, and the case is remanded to the youth court for further proceedings to determine the future status of the mother's parental rights." In the Matter of T.E.R., 590 P.2d at 1121, 36 St.Rep. at 281.

Appellants argue that in light of this decision and the inadequate consideration of the father's rights as a parent herein, this matter should be reversed and remanded, if for no other reason than this inadequate consideration prior to parental termination.

The State and the attorney for the youth contend that the rights of the father were considered. They argue that the father was served with notice of the hearing, was present at the hearing, and had a court appointed attorney to represent his interests. Dr. Tranel testified that, in his opinion, the father would not be able to provide enough influence to offset the marked deprivation described above, nor in fact, would anyone be able to do so. In addition, testimony showed that the father made no effort to assist the mother in learning to become a good parent. He visited the foster home only once while the mother made 38 visits. The homemaker who testified reported that the father never assisted the mother in learning parenting skills and was, in

fact, a distraction. The father did not testify at the hearing. The mother reported to the homemaker that the father had abused the baby by throwing him into the crib.

We believe the record shows that the father's rights were adequately considered prior to termination and that the District Court's decision to terminate them is supported by credible evidence.

The findings of fact and conclusions of law of the trial court and the judgment of the trial court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices