No. 80-483

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

IN THE MATTER OF A.J.S.
Youth In Need of Care.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone.
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Jones Law Firm, Billings, Montana

For Respondent:

Harold F.Hanser, County Attorney, Billings, Montana
Olsen, Christensen & Gannett, Billings, Montana

---

Submitted on briefs: April 8, 1981

Decided: JUN 17 1981

JUN 17 1981

Filed: JUN 15 1981

_Thomas J. Kearney_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

DS, mother of AJS, appeals from an order of the Thirteenth Judicial District Court, Yellowstone County, declaring AJS an abused and neglected child and awarding permanent custody of AJS to the Department of Social and Rehabilitation Services (SRS). We affirm.

Appellant raises these issues:

1. Was the evidence sufficient to support the finding that AJS is a youth in need of care?

2. Is the testimony of a psychologist subsequent to a court-ordered psychological evaluation violative of the psychologist-client privilege?

3. Did the admission of psychologists' testimony resulting from a court-ordered psychological evaluation violate DS's constitutional right of privacy?

4. Does the delay in the adjudication of this matter necessitate reversal?

AJS was born on December 16, 1963, mentally retarded, possibly autistic and with epilepsy, characterized by both grand and petit mal seizures. DS and OS are the natural parents of the youth. OS abandoned the family in 1967 and has had no contact with the family since. DS was subsequently married to a man whom she divorced after discovering the husband sexually abusing AJS. At the time AJS was removed from the family home, DS was living with a man 11 years her junior, in whose care AJS frequently was entrusted.

AJS first began attendance in special education classes at Garfield School in 1972, and has attended continuously since that time. Despite her years of education, AJS is not toilet trained, has very little speech and is considered

-2-

nonverbal. She functions at approximately a two-year-old developmental level.

DS raised and cared for AJS without interference by the authorities until late 1976. At that time, DS placed herself in a six-week drug rehabilitation program to overcome her twelve-year dependence on Darvon and Librium, and left AJS in the care of a foster home. During this period, AJS's appearance and cleanliness improved dramatically, her reported seizure activity subsided and her classroom attitude and aptitude improved. All these conditions deteriorated when AJS returned to her mother's household.

School officials and SRS personnel had from the outset been concerned about the squalid condition of DS's household. The home was consistently filthy, cluttered, frequently had animal excretions scattered about, and had an odor which nauseated visitors to the point that it was difficult for the unaccustomed to remain in the home. DS allowed the house to be used as a flophouse by friends of her other children. These conditions prevailed both before and after the 1976 drug rehabilitation.

While in the care of her mother, the state of AJS's cleanliness and personal hygiene had been distressing to school and SRS personnel from the time her schooling commenced. She frequently came to school with body odor so intensive she was difficult to approach closely, her hair was often greasy and matted with food, and she frequently displayed brown phlegm (apparently a side-effect of Dilantin, her anticonvulsant) hanging from her teeth. AJS occasionally arrived at school unfed, and often slept through large portions of the school day. DS sometimes varied AJS's Dilantin dosages according to the phases of the moon.

Beginning in 1976, school officials also began observing an unusual number of bruises on AJS. Her teacher and the school nurse each noticed, on numerous occasions, finger-marks on the inner aspect of AJS's upper thighs and bruises on both shoulders. When queried about the various bruises, DS typically dismissed them as resulting from falls during seizures (although teachers had observed that AJS knew when a seizure was at hand and would protect herself by lying on a bed prior to onset of the seizure).

In 1979, bruising and injuries to AJS grew drastically more pronounced and frequent. On January 24, AJS arrived at school with a large bruise extending from her right shoulder to her elbow, with a long scratch down the center. On January 26, AJS had several large, dark, streak-type bruises--believed by the nurse to be fingermarks--on the inner portions of each thigh. On February 14, AJS displayed small bruises on her cheeks and nose, and a raised bright red rash over the entire upper portion of her back, with small abrasions in the center of the rash. On February 19, she had six large, deep scratches, each about three inches long, on her left cheek. On February 26, a social worker visiting the home, noticed two black eyes on AJS. Finally, on February 28, the social worker and school nurse visited the home and observed a second-to-third-degree burn approximately ten centimeters long on her left shoulder. She also had a bruise around her left eye across the bridge of her nose, small bruises on her midchest, a small scratch on her upper abdomen, and a small bruise on her right front groin area. AJS was removed from the home the following day, March 1, 1979.

Following her removal, AJS was placed in a foster home for one month, then transferred to a Special Training for Exceptional People (STEP) group home. During the period following her removal, her appearance and personal hygiene again improved, her school attendance improved markedly, and she was more alert while at school. There was also testimony that her reported seizure activity subsided and her performance in school improved.

SRS filed its petition alleging AJS was a youth in need of care on June 29, 1979. The cause was heard by the District Court at multiple hearings held on September 6, 1979; December 6, 1979; April 3, 1980 and June 3, 1980. The District Court entered its findings, conclusions and order on October 31, 1980.

SRS presented as witnesses, school officials, nurses and SRS personnel who testified to substantially the facts found by the Court and related above. Additional testimony was given by Dr. Monty Gustafson, a clinical psychologist, who conducted a court-ordered psychological examination of DS. Dr. Gustafson performed an extensive psychological interview of DS and administered several detailed tests, from which he concluded DS has some organic brain damage as well as a personality disorder termed "inadequate personality." He suggested these conditions greatly interfere with DS's parenting ability, and expressed his opinion that DS is unable to deal adequately with and care for AJS over the long term.

Our function in reviewing dependency and neglect cases has been well defined in a number of previous decisions. Matter of LFG (1979), ___ Mont. ___, 598 P.2d 1125, 36 St.Rep. 1547; In Re Gore (1977), 174 Mont. 321, 570 P.2d 1110. In Gore, we stated:

"This Court is mindful that the primary duty of deciding the proper custody of children is the task of the district court. As a result, all reasonable presumptions as to the correctness of the determination by the district court will be made. [Citation omitted.] Due to this presumption of correctness, the district court's findings will not be disturbed on appeal unless there is a mistake of law or a finding of fact not supported by credible evidence that would amount to a clear abuse of discretion. (Citation omitted.)" 174 Mont. at 325, 570 P.2d at 1112.

We have subsequently held in Matter of JLB (1979), ___ Mont. ___, 594 P.2d 1127, 36 St.Rep. 896, that the court's findings must be supported by clear and convincing evidence. That burden has been sustained here.

DS attacks the sufficiency of the evidence on a number of bases. However, we find clear and convincing evidence of unexplained physical injuries and inadequate concern for the cleanliness and hygiene of AJS to support the court's findings. We therefore address only those areas.

A number of school officials testified of the absolute squalor of DS's household, as related above. The same witnesses provided vivid documentation of the various injuries sustained by AJS, and of her chronic hygienic problems while in the care of her mother. These same people noticed a dramatic turnabout of AJS's cleanliness and physical well-being after she had been removed from the home.

DS, on the other hand, testified that her home was adequately maintained, and that AJS was kept as scrubbed as her condition would allow. DS attributed her daughter's poor school attendance and frequent exhaustion while at school to seizure activity. Falls accompanying seizures were credited by DS for all the various bruises; and the burn resulted from a bath tub accident involving nearly impossible physical contortions by AJS.

Where testimony is directly conflicting, we presume that the judge's findings are correct because he was present when the testimony was given and had the opportunity to observe the demeanor of the witnesses. Matter of TER (1979), ____ Mont. ____, 590 P.2d 1117, 36 St.Rep. 276. Here, the court chose to believe that the home was not properly maintained despite repeated efforts of SRS to provide homekeeping assistance, and that the injuries to AJS were neither adequately nor credibly explained. The court did not abuse its discretion in so finding.

DS submits that since there was no direct evidence that she deliberately inflicted the injuries upon AJS, the finding of abuse and neglect was improper. Section 41-3-102, MCA, defines an abused or neglected child as ". . . a child whose normal physical health or welfare is harmed or threatened with harm by the acts or omissions of his parent or other person responsible for his welfare." Regardless of any actual proof that a parent intentionally inflicted injuries upon his or her child, the occurrence of serious and frequent, yet unexplained, physical injuries to the child is sufficient to properly bring the child within the statutory definition. Additionally, the statute is broad enough to include extreme and prolonged uncleanliness under the definition of neglect. JLB, supra, 594 P.2d at 1135, 36 St.Rep. at 907.

DS moved in limine, relying on section 26-1-807, MCA, the psychologist-client privilege, to exclude Dr. Gustafson's testimony. The motion was denied and the evidence subsequently received. DS argues that she trusted Dr. Gustafson, expected their communications to remain confidential; and insists her expectation should be honored. We reject this argument.

-7-

We instead find that there was in fact no psychologist-client relationship between Dr. Gustafson and DS. Section 26-1-807, MCA, places the relationship of psychologist and client on the same status as attorney and client. In that regard, a party is entitled to the protection accorded to privileged communication if the communications have been made to an attorney acting, for the time being, in the character of legal advisor for the purpose of securing professional advice or aid upon the subject of the client's rights and liabilities. Bernardi v. Community Hospital Association (1968), 166 Colo. 280, 443 P.2d 708, 716. Here DS did not seek out and retain Dr. Gustafson for professional help, but was ordered by the Court to undergo an evaluation. Nor were the communications between the two directed toward securing professional assistance for DS. The privilege clearly did not attach in this instance.

This issue is somewhat complicated by a previous contact between DS and Dr. Gustafson in an unrelated matter. However, even assuming arguendo, that the previous contacts did establish a psychologist-client relationship, it was yet within the discretion of the District Court to consider the testimony. In proceedings of this type, the child's best interest and welfare, not those of the natural mother, are the paramount considerations. In re Bad Yellow Hair (1973), 162 Mont. 107, 509 P.2d 9. The District Court must balance the rights of the mother and the child; and while the mother's rights are important, they are not absolute. Matter of CMS (1979), ___ Mont. ___, 609 P.2d 240, 36 St.Rep. 2004. In some instances, the best interests of the child require some degree of flexibility in procedure to insure that all evidence pertaining to the best interests of the child may be considered.

-8-

TER, supra. In applying these rules, we find this language pursuasive: "in the exercise of the court's inherent power to do what is best to protect the welfare of the infant, the right of [the mother] to invoke the patient-physician privilege must yield to the paramount rights of the infant." People v. Fitzgerald (1963), 40 Misc.2d 966, 244 N.Y.S.2d 441, 442.

DS next argues the admission of Dr. Gustafson's testimony violated her right to individual privacy under 1972 Mont. Const., Art. II, § 10. The record indicates this argument is raised for the first time here on appeal. The District Court was presented with and decided only the question of privileged communications. DS may not now raise the issue of infringement of her right to privacy. It is well settled that a party may not change a theory to this Court from that advanced at trial court. Velte v. Allstate Ins. Co. (1979), ___ Mont. ___, 593 P.2d 454, 36 St.Rep. 724. See also, Johnson v. Doran (1975), 167 Mont. 501, 540 P.2d 306.

DS finally submits, without citation of authority, that the District Court should be reversed for failure to handle this cause expeditiously. We agree that the interval here of 20 months between the time of removal from the home until the final order was long; and we exhort District Courts to give preference to custody cases. Section 41-3-401(2), MCA. We believe, however, that reversal here would be an ill-advised and improper sanction.

We reiterate that our paramount concern is for the best interest of the child. Bad Yellow Hair, supra. Here, the court did act somewhat slowly in permanently removing AJS from an abusive environment. However, were we to replace the child in that abusive environment due to the District

-9-

Court's deliberate pace, we would be negating our expressed concerns for the child's best interests. The delay does not necessitate reversal.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
,

_____
Justices