303 S.E.2d 685 (1983)
STATE of West Virginia
v.
T.C., Infant and B.B., Mother; and P.B., Stepfather.
No. 15793.
Supreme Court of Appeals of West Virginia.
May 25, 1983.
*686 Chauncey H. Browning, Atty. Gen., and Mary Beth Kershner, Asst. Atty. Gen., Charleston, for appellant.
Howard J. Blyler, Cowen, for appellees.
MILLER, Justice:
This is an appeal by the State of West Virginia protesting an order of the Circuit Court of Nicholas County, which restored the custody of T.C., then age four and one-half years, to the appellees, the child's mother and stepfather. We are asked to determine what procedures are required by West Virginia law in cases of alleged child abuse and to determine if those requirements were met in this case.
In June, 1980, T.C., then age three and one-half years, was brought by her stepfather, P.B., to the emergency room of the hospital in Summersville. He explained that the little girl had injured her leg by falling in the bathtub while bathing. X-rays taken in Summersville and subsequently in Charleston revealed a spiral fracture of her left upper leg and a healing spiral fracture of her left upper arm. Pursuant to these findings, a report of child abuse was made to the Department of Welfare in Nicholas County under W.Va.Code, 49-6A-2.[1]
*687 In July, 1980, the Department of Welfare filed a petition for emergency custody of T.C., and an order was entered removing her from the custody of her mother and stepfather and placing the child with her mother's aunt.
At a hearing on July 23, 1980, the testimony of Dr. Jacobson, who had examined T.C. at the Summersville hospital, was presented. The doctor's opinion was that the child's fractures could only have been caused by "a significant rather marked force applied in the opposite direction to the upper and lower end of the leg." Before the next witness could testify, a private conference was held by the child's parents, the Welfare personnel, and all counsel. The parties agreed that the child would be taken out of the aunt's custody and placed in a foster home, that the mother and stepfather would undergo psychological evaluations, and that the parents could visit the child during this period. The court approved this agreement, but no finding of abuse was made.
No further action was taken in this case for almost eight months. On March 6, 1981, Welfare Department workers, the parents, and counsel for the parties again appeared before the court. At that time, the court was advised of what had transpired since the last hearing, but no evidence was taken. The court noted that the parents' psychological evaluations in 1980 had not revealed "anything bad" and that no criminal charges had been brought against P.B.[2] Based upon further information that the child had been out of the parents' home for a long time, and that visitation arrangements had been difficult in the foster home and at alternative sites, the court determined that the child's custody should be returned to the parents after a transition period of five-weeks of increased visitation. No order was entered reflecting these arrangements.
On August 10, 1981, over one year after T.C.'s injuries, a third hearing was held. This hearing was apparently based on a new petition filed in June, 1981, by the Welfare Department, which alleged the same instances of abuse as set forth in the first petition and the need for a rehabilitation program. This hearing was, however, conducted as a continuation of earlier proceedings and has been referred to by the appellants as a dispositional hearing under W.Va.Code, 49-6-5. Again, no testimony was heard. The Nicholas County Prosecuting Attorney acknowledged that the child was then in the custody of the parents.[3] The prosecutor requested that legal custody remain with the Department such that the child could physically reside with her parents but that the Department could legally enter the home at frequent intervals to observe and monitor the home situation. At the August 10, 1981, hearing the court ordered a "rehabilitation plan" such that the legal and physical custody went to the parents, and that the Welfare Department would be permitted to monitor the child and the home. The order was entered in October, 1981.
In April, 1982, the State appealed the order returning custody to the parents, and requested a stay of that judgment. We granted the appeal and stay, and on January 26, 1983, ordered that temporary physical custody be awarded to the Department of Welfare pending the outcome of this decision.
The State's primary argument is that W.Va.Code, 49-6-1, et seq., requires certain mandatory hearings and findings by a circuit *688 court once an abuse or neglect petition has been filed, and that these statutory requirements have not been met. In State ex rel. Miller v. Locke, W.Va., 253 S.E.2d 540 (1979), we found that W.Va.Code, 49-6-1, et seq., meets the constitutional due process standards set out in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and in In Re: Willis, 157 W.Va. 225, 207 S.E.2d 129 (1973). We also concluded that its various sections should be read in pari materia.
It is instructive to briefly review some of the procedural steps authorized by this statute. The content and service of the initial petition to institute a child abuse or neglect proceeding is contained in W.Va.Code, 49-6-1. In the next section, general provisions are made for the right to counsel and the appointment of counsel in cases of indigency. This section also permits the parents or custodian to have an improvement period, provides for hearing rights (i.e., a meaningful opportunity to be heard), and requires that the court "shall make findings of fact and conclusions of law as to whether such child is abused or neglected." W.Va.Code, 49-6-2(c). Finally, this section authorizes the right to a transcript of the hearing for purposes of an appeal. W.Va.Code, 49-6-2(d).
It is important to note the interrelationship between W.Va.Code, 49-6-2, and W.Va.Code, 49-6-5, which provides for dispositional alternatives and begins with this statement:
"Following a determination pursuant to section two [§ 49-6-2] of this article, the court may request from the state department information about the history, physical condition and present situation of the child. The court shall forthwith proceed to disposition giving both the petitioner and respondents an opportunity to be heard. The court shall give precedence to dispositions in the following sequence."
We believe that the statutory structure is clear and that before a court can begin to make any of the dispositional alternatives under W.Va.Code, 49-6-5, it must have held a hearing under W.Va.Code, 49-6-2, and have determined "whether such child is abused or neglected." Such a finding is the prerequisite to any further proceedings in the case. If the court determines that there is insufficient evidence to warrant a finding of abuse or neglect, then the petition is dismissed under W.Va.Code, 49-6-5(a)(1). On the other hand, if neglect or abuse is found, then the other dispositional alternatives under W.Va.Code, 49-6-5, are to be considered.[4]
The primary purpose of making an initial finding of abuse or neglect is to protect the interest of all parties and to justify the continued jurisdiction under W.Va.Code, 49-6-1, et seq. Several courts have spoken *689 to this issue under statutes which are analogous to ours, as illustrated by this discussion in In the Interest of T.M.M., 267 N.W.2d 807, 812 (N.D.1978):
"The Act clearly provides for a two-stage hearing on petitions alleging deprivation. The first phase of the hearing is often referred to as the adjudicatory phase, wherein the only question for decision is whether the child is `deprived' within the meaning of Section 27-20-02, subsection 5. In the adjudicatory phase of the hearing, the primary issue is not what is in the best interest of the child, but rather whether there is clear and convincing evidence that the child is deprived. Interest of R.D.S., 259 N.W.2d 636 (N.D.1977); In Interest of M.L., [239 N.W.2d 289 (N.D.1976) ]. It is only after the court has found the child to be deprived that the question of what disposition will best serve the interests of the child arises.
"The second phase of the hearing, the dispositional phase, is to be conducted only after the court has first found the child deprived. If there is no such finding, the court `shall dismiss the petition' and no longer has jurisdiction of the case. In Interest of M.L., supra."
A similar result was reached by the Montana court in In the Matter of L.F.G., 183 Mont. 239, 245-46,, 598 P.2d 1125, 1129 (1979), where the court stated:
"[T]hese statutes make it clear that a finding of abuse, neglect, or dependency is the jurisdictional prerequisite to any court ordered transfer of custody.... Appellants argue it is then, and only then, that the `best interest of the child' standard so well established by this Court has its application in the resolution of the question of custody.... Thus, before the District Court may consider what the `best interests of the child' may in fact be, the court must have found that the child in question was in fact abused or neglected pursuant to statutory definition in section 41-3-102(2), MCA." (Citations omitted)
See also Custody of a Minor, 377 Mass. 876, 389 N.E.2d 68 (1979); In the Interest of LaRue, 244 Pa.Super. 218, 366 A.2d 1271 (1976).
While today's result is based upon our construction of W.Va.Code, 49-6-1, et seq., we are aided by this Court's decision in In Re: Willis, supra, which established the constitutional protections afforded to parents in permanent child removal cases. In Syllabus Point 6, the "clear, cogent and convincing" standard of proof was set, and that standard was recently adopted under Fourteenth Amendment Due Process principles in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In Syllabus Point 8 of Willis, supra, we also said:
"Once a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody."
The central theme of Willis was that the integrity of the family as a unit arises from the freedom of choice in matters of family life, which is a "fundamental personal liberty guaranteed by the Due Process Clause of the Fourteenth Amendment." 157 W.Va. at 237, 207 S.E.2d at 136, citing Stanley v. Illinois, supra. Similar language is found in Santosky v. Kramer, supra. As recognized in Willis and in United States Supreme Court cases, the state does have a right to intervene where parents are shown to be unfit to protect the interests of the children, as illustrated by this quotation from Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978):
"We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' *690 Smith v. Organization of Foster Families, 431 U.S. 816, 862-63, [97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 46-47] (1977) (Stewart, J., concurring in judgment)." (Emphasis added)
It is apparent that the state's right to intervene is predicated upon its initial showing that there has been child abuse or neglect, which constitutes unfitness on the part of the parents to continue, either temporarily or permanently, in their custodial role.
In the present case, the hearing under W.Va.Code, 49-6-2, was aborted when the parties entered into some type of voluntary arrangement regarding the custody of T.C. While we do not find that W.Va.Code, 49-6-1, et seq., forecloses the ability of the parties, properly counseled, in a child abuse or neglect proceeding, to make some voluntary dispositional plan, such arrangements are not without restrictions. First, the plan is subject to the approval of the court. Second, and of greater importance, the parties cannot circumvent the threshold question, which is the issue of abuse or neglect.[5] Thus, we find that the procedure in the lower court contains a palpable error, which is the absence of an initial finding by the court that there has or has not been child abuse or neglect. Absent such a finding, the dispositional aspects of the case could not be considered.
It could be that some confusion was engendered in the lower court by the fact that the child had been initially taken into temporary custody under W.Va.Code, 49-6-3(a). The parties and the court appeared to conceive that the issue at the July 23, 1980, hearing was whether temporary custody should be continued. However, it is clear that W.Va.Code, 49-6-3(a), permitting an ex parte taking of temporary custody, does not provide for a further hearing to determine whether temporary custody should be continued.[6] This provision, as we have stated in State ex rel. Miller v. Locke, W.Va., 253 S.E.2d at 542-43, is designed to permit
"a circuit court to order emergency-taking only after the court has found (1) that there exists an imminent danger to the physical well-being of the child; and (2) that there are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychological, or homemaking services to eliminate the danger and permit the child to remain in his current custody."
Furthermore, while W.Va.Code, 49-6-3(b),[7] authorizes an alternative procedure *691 for a court to utilize in taking temporary custody of a child by providing for an expedited preliminary hearing with notice to the parents, this procedure does not operate to bypass the hearing to determine neglect or abuse required under W.Va.Code, 49-6-2. This construction arises because of the provision in W.Va.Code, 49-6-3(b), that requires the court to find "that there are no alternatives less drastic than removal of the child and that a hearing on the petition cannot be scheduled in the interim period." (Emphasis added)
Because there was no initial finding of abuse in this case, we must remand this case with directions that the lower court promptly hold a hearing under W.Va.Code, 49-6-2, in order to determine if the child was abused. At such hearing, the court may consider the evidentiary transcript of the July 23, 1980, hearing since all parties were present and had an opportunity to cross-examine. After holding the hearing and making findings of fact of whether the child was abused, the lower court should then proceed to make an appropriate disposition under W.Va.Code, 49-6-5.
Remanded.
NOTES
[1] The relevant portion of W.Va.Code, 49-6A-2, is:

"When any medical, dental or mental health professional, christian science practitioner, religious healer, schoolteacher or other school personnel, social service worker, child care or foster care worker, peace officer or law-enforcement official has reasonable cause to suspect that a child is neglected or abused or observes the child being subjected to conditions that are likely to result in abuse or neglect, such person shall immediately report the circumstances or cause a report to be made to the state department child protective service."
[2] Ordinarily, whether or not the State has filed criminal charges in regard to child abuse is irrelevant in a proceeding under W.Va.Code, 49-6-1, et seq., to remove custody of the child. In the Interest of Black, 273 Pa.Super. 536, 417 A.2d 1178 (1980). The purpose of the removal proceeding is to protect the well-being of the child.
[3] Apparently, one week before this hearing the Welfare Department had, pursuant to its newly filed petition, again removed T.C. and replaced her in the foster home. Immediately thereafter, the parents retrieved the child.
[4] The material dispositional provisions of W.Va.Code, 49-6-5(a), are:

"The court shall give precedence to dispositions in the following sequence:
"(1) Dismiss the petition;
"(2) Refer the child and the child's parent or custodian to a community agency for needed assistance and dismiss the petition;
"(3) Return the child to his own home under supervision of the state department;
"(4) Order terms of supervision calculated to assist the child and the child's parent or custodian which prescribe the manner of supervision and care of the child and which are within the ability of the parent or custodian to perform;
"(5) Upon a finding that the parents or custodians are presently unwilling or unable to provide adequately for the child's needs, commit the child temporarily to the custody of the state department, a licensed private child welfare agency or a suitable person who may be appointed guardian by the court;
"(6) Upon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future, and when necessary for the welfare of the child, terminate the parental or custodial rights and responsibilities and commit the child to the permanent guardianship of the state department or a licensed child welfare agency. Notwithstanding any other provisions of this article, the permanent parental rights shall not be terminated if a child fourteen years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination. No adoption of a child shall take place until all proceedings for termination of parental rights under this article and appeals thereof are final."
[5] We recognize that W.Va.Code, 49-6-2(c), provides that in an abuse or neglect case "[t]he petition shall not be taken as confessed." We conceive that this provision is designed to preclude a court from removing custody based merely on the allegations of the original petition. In In re Nicole B., 93 Cal.App.3d 874, 155 Cal.Rptr. 916 (1979), the court found that under voluntary stipulations by the parties a showing of abuse and neglect had been made. See also State v. Worrell, 198 Neb. 507, 253 N.W.2d 843 (1977).
[6] W.Va.Code, 49-6-3(a), states:

"Upon the filing of a petition, the court may order that the child be delivered for not more than ten days into the custody of the state department or a responsible relative, pending a preliminary hearing, if it finds that: (1) There exists imminent danger to the physical well-being of the child, and (2) there are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody. The initial order directing such custody shall contain an order appointing counsel and scheduling the preliminary hearing, and upon its service shall require the immediate transfer of custody of such child to the state department or a responsible relative."
[7] W.Va.Code, 49-6-3(b), provides:

"Whether or not the court orders immediate transfer of custody as provided in subsection (a) of this section, if the facts alleged in the petition demonstrate to the court that there exists imminent danger to the child, the court may schedule a preliminary hearing giving the respondents at least five days' actual notice. If the court finds at the preliminary hearing that there are no alternatives less drastic than removal of the child and that a hearing on the petition cannot be scheduled in the interim period, the court may order that the child be delivered into the temporary custody of the state department or an appropriate person or agency for a period not exceeding thirty days: Provided, that if the court grants an improvement period as provided in subsection (b), section two [§ 49-6-2] of this article, the thirty-day limit upon temporary custody may be waived."