IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2025 Term

_____

No. 24-357

_____

FILED

**November 12, 2025**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE R.M., B.M., and H.M.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Jennifer F. Bailey, Judge
Civil Action Nos. 23-JA-40, 23-JA-41, and 23-JA-42

AFFIRMED

_____

Submitted: October 7, 2025
Filed: November 12, 2025

Sandra K. Bullman, Esq.
Bullman and Bullman
Charleston, West Virginia
Attorney for the Petitioner Mother

John B. McCuskey, Esq.
Attorney General
Michael R. Williams, Esq.
Solicitor General
Charleston, West Virginia
Attorney for the Respondent
Department of Human Services

Bryan B. Escue, Esq.
Hunter Escue Law Practice
Hurricane, West Virginia
Guardian ad litem for Minor Children

JUSTICE BUNN delivered the Opinion of the Court.

JUSTICE EWING and SENIOR STATUS JUSTICE HUTCHISON concur and reserve the right to file separate opinions.

**SYLLABUS BY THE COURT**

1.    "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.    "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

3. "In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives under W. Va. Code [§ 49-4-604], it must hold a hearing under W. Va. Code [§ 49-4-601], and determine 'whether such child is abused or neglected.' Such a finding is a prerequisite to further continuation of the case." Syllabus Point 1, *State v. T.C.*, 172 W. Va. 47, 303 S.E.2d 685 (1983).

4. Specific findings of fact explaining how each child's health and welfare is being harmed or threatened by the abusive or neglectful conduct of the parties named in the petition are a statutory prerequisite for the circuit court to proceed to the dispositional phase, not a requirement for establishing or maintaining subject matter jurisdiction. To the extent that Syllabus Point 3 of *In re B.V.*, 248 W. Va. 29, 886 S.E.2d 364 (2023), holds otherwise, we expressly overrule that portion of Syllabus Point 3.

5. "[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]" Syllabus Point 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

**BUNN, Justice:**

The petitioner, C.N. ("Mother"), appeals the May 17, 2024 order of the Circuit Court of Kanawha County terminating her parental rights to her three children, R.M., B.M., and H.M.[1] On appeal, Mother contends that the circuit court erred by terminating her parental rights without granting her a post-adjudicatory improvement period. In aid of addressing the issues presented in this appeal, this Court also requested supplemental briefing regarding whether "specific factual findings regarding the abuse and/or neglect at the conclusion of the adjudicatory hearing are a jurisdictional requirement without which a circuit court may not proceed to disposition under any circumstances."

Observing the distinction between subject matter jurisdiction and statutory authority to proceed to disposition, we conclude that specific factual findings are not a requirement for a court to establish or maintain subject matter jurisdiction to proceed to disposition, but rather are procedural requirements emanating from our abuse and neglect statutes and rules. We further conclude that the circuit court did not err, under the specific facts of this case, and, accordingly, affirm the circuit court's order terminating Mother's parental rights to her three children.

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

In February 2023, the West Virginia Department of Human Services ("DHS")[2] filed a petition alleging that Mother and the father abused and neglected their three children by abusing substances to the extent that their ability to parent and obtain employment was impaired. The petition also asserted that Mother and the father, exposed the children to unsanitary and unsafe housing conditions and failed to provide the children with "necessary food, clothing, supervision, and housing." The DHS contended that H.M., the eldest child, did not live in the parents' home, but instead resided with her grandmother two miles away and that H.M. attended school unbathed and wore dirty clothes.[3] The DHS's petition further detailed that the two younger children, R.M. and B.M., were frequently in heavily soiled diapers and that Mother refused to participate in Birth to Three services,[4] which were recommended for R.M. and B.M. The DHS asserted that several

---

[2] Pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the DHS.

[3] The grandmother was not a party to the abuse and neglect petition. The testimony surrounding H.M. varied slightly, but suggests that generally, she lived with her grandmother but spent weekends and other times at her parents' home. As a result, despite living with her grandmother, the evidence demonstrated that H.M. was nonetheless exposed to the alleged conditions of abuse and neglect in the parents' home.

[4] "West Virginia Birth to Three is an early intervention program that partners with families and caregivers to build upon their strengths by offering coordination, supports

2

individuals called law enforcement after witnessing Mother "nodding off" when dropping off H.M. at school and the witnesses also reported seeing Mother sitting on the sidewalk with her feet in the road, holding her side, and crying after she left the school. Following the reports, law enforcement visited the parents' home where officers observed clutter and animal feces throughout the residence. One of the officers noticed that none of the bedrooms in the home "were able to be used for sleeping because there was junk and clothes everywhere." That same officer reported that "the home was unsuitable for . . . children to live in, and directed that [Child Protective Services ('CPS')] be called."

In March 2023, the circuit court held a preliminary hearing. Two law enforcement officers testified as to the home's condition. One officer testified that after receiving multiple calls reporting Mother's behavior described above, she visited the home for a welfare check. Mother refused to let the officer in the home, but the officer could smell animal urine and feces.[5] While at the home, the officer called her supervising officer to assist. The supervising officer also testified and stated that Mother allowed him to enter the home. It "was very apparent" that everyone in the household lived in the living room

[sic], and resources to enhance children's learning and development." *In re N.H.*, No. 17-0358, 2017 WL 3868015, at *1 n.3 (W. Va. Sept. 5, 2017) (memorandum decision).

[5] The officer further testified that she later obtained what appeared to be text messages that Mother sent to Mother's brother indicating that Mother's boyfriend, who is also the children's father, was going to physically beat her. Mother denied sending those text messages.

and that the parents had not used the kitchen for food preparation in "quite some time." The supervising officer further observed that, due to extreme clutter, the kitchen was inaccessible and full of dirty dishes, and that one of the bedrooms was also inaccessible because of piled up boxes and furniture. While one of the bedrooms was accessible, there was no bed in the room. The supervising officer also testified that he observed multiple animals and animal feces in the home. At the conclusion of the visit, the supervising officer advised the other officer to contact CPS to conduct a welfare check on the children.

Mother and the father also testified at the preliminary hearing. Mother stated that she had one dog and three cats, and that although she admitted there was dog feces on the floor when the officers entered the home, she stated it was limited to waste on a piece of cardboard because the dog had been put away for visitors. She agreed the kitchen was "very cluttered" and that CPS gave her seven days to remediate the conditions of the home. She denied using drugs except for "pot." The father testified that he cooked for the family every day in the kitchen and that the home was cluttered due to the children's toys but was in a livable condition. He denied that there was drug or alcohol use in the home other than his occasional marijuana use. He further clarified that H.M. lived in the home, but frequently spent nights at her grandmother's home. *See supra* n.3.

In a subsequent order, the court ratified the removal of the children from the home, finding that there was imminent danger to their well-being at the time of removal

4

and that there were no reasonable alternatives to removal. The court ordered that the parents receive adult life skills and parenting education, bus passes, drug testing, and supervised visits after negative drug screens.

Thereafter, the circuit court held multiple adjudicatory hearings on April 27, 2023, June 7, 2023, October 3, 2023, November 15, 2023, January 12, 2024, and February 14, 2024. The court continued the first hearing upon requests from counsel to gather additional evidence, including the DHS's request to further investigate allegations of medical neglect. During the second hearing, in June 2023, the DHS moved the court to take judicial notice of the evidence and testimony adduced at the preliminary hearing and to further continue the matter until a later date. The court granted both motions.

At the October 3, 2023 adjudicatory hearing, the DHS presented three expert witnesses who also treated the children. These witnesses discussed the children's medical problems, including malnutrition and other feeding issues, speech issues, and developmental delays. Julie Blake, a Speech-Language Pathologist and Orofacial Myofunctional Therapist, evaluated all three children and opined that "a lack of exposure

5

or lack of opportunity" caused B.M.'s feeding[6] and speech issues.[7] In other words, Ms. Blake testified that the child's "environment" caused the developmental delays, rather than a structural or medical condition. Ms. Blake next described her examination of H.M.,[8] who had previously been diagnosed with a chronic pediatric feeding disorder and anorexia. H.M. had significant dental issues as well as feeding issues. She took hours to eat simple foods, and she needed a great deal of encouragement and reward to continue to eat. Ms. Blake opined that H.M. would have benefited from other interventions, including Birth to Three, a feeding specialist, and certain dental care. Finally, Ms. Blake described her examination of R.M.[9] When she initially met with R.M., he had just been placed on an internal feeding tube and "would not allow a spoon to be brought to his mouth, but he would play with his spoon with his hands." She stated that R.M. "has a really high palate" developed from long-term bottle use, which can cause certain eating issues:

> He struggles with closing his lips, and he struggles with nose-breathing because he is an open-mouth breather, lips open. He has a tongue forward posture . . . that makes eating difficult, and he is very sensory defensive. So[,] bringing the food to his lips has taken a lot of work over the course of therapy. He has been very hesitant.

---

[6] Generally, these issues included food aggression, lack of ability to use age-appropriate eating utensils, and lack of ability to eat age-appropriate foods.

[7] At the time of the evaluation, B.M. was three years and two months old, but her score indicated that she was at the levels of a seventeen-month-old for her understanding of language and a twenty-month-old for expressing language.

[8] H.M. was nine years old at the time of her examination.

[9] When Ms. Blake first examined R.M., he was almost two years old.

6

Ms. Blake further explained that R.M.'s "motor skills were directly impacting his feeding skills, and a team of therapists like [a] physical therapist, occupational therapist, speech therapist, [and] feeding therapist should have all worked together to help [R.M.] achieve developmental milestones and then his feeding would not have been impacted if other milestones had been achieved." She stated that R.M. was "globally delayed": "He is delayed in speech, feeding, fine motor, [and] gross motor skills. So a global impairment. So that would make him considered a special needs child."[10] Ms. Blake opined that a "[l]ack of exposure, lack of opportunity, [and] lack of resources to develop skills he needed" caused R.M.'s developmental delays.

Jenna Runyan, a speech-language pathologist, and Rachel Malone, a physical therapist, also testified.[11] These witnesses testified consistently with Ms. Blake's testimony, including their agreement that proper interventional services, such as Birth to Three, could have remedied or significantly improved the children's feeding and speech issues. Furthermore, the witnesses testified that many of these deficiencies were caused by the children's environment.[12]

---

[10] R.M. was also diagnosed with mitochondrial mutation, a genetic disorder.

[11] Ms. Runyan provided services to only R.M. and H.M., and Ms. Malone provided services to only R.M.

[12] Acknowledging that she was not an expert in R.M.'s genetic disorder, Ms. Runyan testified that she had researched the condition and stated that she "d[id] not think that that [the genetic disorder was] the underlying cause of all of his issues," however, "it could be

7

The court continued the adjudicatory hearing to November 15, 2023, where Mother testified on her own behalf. Mother discussed the living conditions when the children lived with her and the father, describing the home as "cluttered but . . . clean." Mother stated there was a "playpen and a toddler bed in the living room and then [H.M.] had her own room with a queen-sized bed." Regarding the children's healthcare, Mother claimed that she regularly took the children to the doctor's office and that the children participated in Birth to Three services prior to their removal, but that those services abruptly ended, and she attempted to contact those providers to no avail.[13] Mother admitted that she used illegal substances in the past, including methamphetamine, shortly before the DHS filed the petition in this matter. She indicated that she and the father used "meth" together but sometimes they would alternate when they used it. In general, Mother testified that she used methamphetamine about three times a week, but asserted that she had not used drugs in the six months prior to the adjudicatory hearing.[14] Although Mother admitted

---

a contributing factor." Nonetheless, despite his genetic disorder, R.M. had made significant progress since working with her on his feeding issues. Ms. Malone also stated that R.M. had made progress working with her on his physical issues.

[13] This testimony is contrary to Ms. Malone's previous testimony that the Birth to Three records demonstrated that those services ended because they lost communication with Mother.

[14] Mother tested positive for marijuana in October 2023, but claimed the test was incorrect.

8

to using drugs, she also testified that "[a]ll I did was miss one [doctor's] appointment and that's being held against me."

Mother presented two additional witnesses. First, a former coworker and friend of Mother testified that the house was clean but cluttered; however, she confirmed that she and Mother used methamphetamine and marijuana together on their breaks while working. Next, the maternal grandmother stated that, at one point, H.M. started missing numerous days of school because the parents were oversleeping, prompting the grandmother to bring H.M. to her home. The grandmother further testified that the parents' home was cluttered and that there were dirty dishes in the sink and on the counter.

Finally, the children's foster parent testified to the children's fragile conditions when placed in the foster home, including R.M.'s inability to crawl or hold up his head. The foster mother further stated that when she initially took R.M. home, she could feel his ribs and that it was "[l]ike he hadn't been fed in months[.]" Mother presented rebuttal testimony disputing the claim that R.M. was unable to crawl. At the conclusion of the hearing, Mother's counsel requested to submit additional medical records, and the court continued the hearing to allow the parties to review those records.

On January 12, 2024, the circuit court held a fifth adjudicatory hearing. At this hearing, Mother moved to supplement the record with certain medical records. The

9

court advised that it needed time to review the medical records and continued the hearing. One month later, on February 14, 2024, the circuit court held a sixth and final adjudicatory hearing and adjudicated the children as abused and neglected by stating the following on the record:

> The Court: . . . I find that based upon the evidence in this case these children have been abused and neglected under the meaning of the law.
>
> There is substantial evidence to that effect, and so that is my ruling.
>
> None of the records have convinced me any differently, and so that is my ruling, and I am going to schedule these matters for disposition.
>
> . . . .
>
> I did make a finding that the [DHS] has sustained its burden to establish that the children are abused and neglected within the meaning of the law, and I am scheduling these matters for disposition.

The court did not enter a written adjudicatory order at that time, and none of the parties raised an objection to the lack of a written order or specific factual findings.

The circuit court held a dispositional hearing on March 27, 2024, at which it first heard Mother's request for a post-adjudicatory improvement period.[15] The court found

---

[15] On the day of the dispositional hearing, Mother served the parties a one-sentence written motion for a post-adjudicatory improvement period.

that this case was "one of the most severe cases . . . as far as the extreme neglect and abuse of these children and the conditions that were found at the time of the filing of the petition." In support, the court stated that "[o]ne of the children was suffering so much that [it] . . . had to order that she be transported out of state to attempt to save her life. There were no facilities in West Virginia who can even address the severity of the malnutrition that she was suffering." The court further found that Mother continued to use drugs, failed to acknowledge her parenting problems, and did not understand, appreciate, or acknowledge the severity of the children's conditions. As such, the court denied Mother's motion for an improvement period and proceeded to disposition.

The assigned CPS worker testified at the dispositional hearing that the DHS recommended termination of Mother's parental rights due to the severity of the abuse and neglect inflicted upon the children. The worker stated that Mother tested positive for marijuana and methamphetamine throughout the proceedings and refused to participate in any kind of drug treatment program, as she claimed she was no longer using drugs. Specifically, the worker testified that Mother tested positive for marijuana nine times in January 2024 and four times in February 2024, in addition to testing positive for methamphetamine and amphetamine on March 20, 2024—only seven days before the dispositional hearing. Despite this positive drug test, Mother testified that she had not used methamphetamine since July 3, 2023. Mother admitted to using marijuana in the preceding two months but claimed it was because she was having a "hard time." Mother asserted that

H.M. was diagnosed with anorexia after being removed from the home and that she could not "expect [her] children to be fat" given that she was skinny.

The circuit court terminated Mother's parental rights in a written dispositional order reiterating "that this [wa]s one of the most severe cases." It further found that Mother continued to use drugs and deny responsibility for the children's conditions, and "failed to grasp the facts and . . . to acknowledge [the] severity of the children's condition[s]." Based upon the evidence presented, the court found that the parents subjected the children to extreme malnourishment and malnutrition, and that the children lacked basic skills and suffered in the parents' home. The court again acknowledged that Mother demonstrated "an unwillingness and inability to acknowledge [her] culpability in [the] matter," rendering "an improvement period an exercise in futility at the children's expense." Ultimately, the court terminated Mother's parental rights to the three children, finding that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future; the children's best interests required termination of the petitioner's parental rights; and there were no reasonable, available, less drastic alternatives.[16]

---

[16] During this hearing, the circuit court also terminated the father's parental rights. He did not file an appeal.

12

Petitioner then appealed the final dispositional order.[17] On September 26, 2025, this Court ordered the parties to submit concurrent supplemental briefing to "address whether specific factual findings regarding the abuse and/or neglect at the conclusion of the adjudicatory hearing are a jurisdictional requirement without which a circuit court may not proceed to disposition under any circumstances."

## II.

## STANDARD OF REVIEW

We review a circuit court's factual determinations and legal conclusions in an abuse and neglect case pursuant to the following well-established standard:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a

---

[17] After Mother filed her notice of appeal, the circuit court entered an adjudicatory order nunc pro tunc. Therein, the court found by clear and convincing evidence that, based upon conditions at the time of the petition's filing, Mother was an abusing and neglectful parent and the children were abused and neglected. The court further found that "the record establishes substantial evidence of neglect, and the medical records submitted by [Mother] do not convince the Court otherwise."

13

finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). Furthermore, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

## III.

## DISCUSSION

On appeal, Mother raises one assignment of error: that the circuit court erred by terminating her parental rights without the opportunity for a post-adjudicatory improvement period. However, before we reach the merits of Mother's assignment of error, as an initial question, this Court must decide whether a lack of specific findings regarding adjudication deprived the circuit court of subject matter jurisdiction to proceed to the dispositional phase. We determine that it did not. Furthermore, we conclude that the circuit court did not err in denying Mother a post-adjudicatory improvement period.

### *A. Jurisdiction*

Mother did not challenge her adjudication on appeal. However, the DHS, in its response brief, conceded that the circuit court "failed to make specific factual findings . . . explaining how each child's health and welfare is being harmed or threatened

by the abusive or neglectful conduct" by Mother in this matter. While the DHS asserts that based upon this Court's current jurisprudence, this absence of specific findings deprived the circuit court of jurisdiction to proceed to disposition, it further noted that "if the Court were inclined to reconsider its view that specific factual findings are a *jurisdictional* requirement that cannot be waived, then the [DHS] would request supplemental briefing on that issue[.]" The DHS contends that Mother "has never objected to the sufficiency of the adjudicatory order" and that this type of case demonstrates the risk of disruption and waste from a jurisdictional label. We ordered supplemental briefing on the issue, and in its supplemental briefing, the DHS argues that this Court should hold that the absence of specific findings of fact regarding adjudication does not deprive the circuit court of subject matter jurisdiction. We agree with the DHS and take this opportunity to clarify our recent case law surrounding subject matter jurisdiction in abuse and neglect matters.

Two years ago, in a case involving several children in legal guardianships, this Court addressed the absence of specific adjudicatory factual findings as affecting the court's authority to proceed to disposition. We held, in part, that to exercise subject matter jurisdiction in an abuse and neglect matter following adjudication, the circuit court must have first made specific factual findings regarding the abuse and/or neglect:

> The mere fact that a child is in a legal guardianship at the time an abuse and neglect petition is filed does not preclude a circuit court from exercising subject matter jurisdiction in adjudicating whatever rights a respondent to that petition may still have to that child, provided that the child meets the

15

definition of an "abused child" or "neglected child" as defined in West Virginia Code § 49-1-201 (2018) so as to confer that jurisdiction. To exercise subject matter jurisdiction, the court must make specific factual findings explaining how each child's health and welfare are being harmed or threatened by the allegedly abusive or neglectful conduct of the parties named in the petition. Due to the jurisdictional nature of this question, generalized findings applicable to all children named in the petition will not suffice; the circuit court must make specific findings with regard to *each* child so named.

Syl. Pt. 3, *In re B.V.*, 248 W. Va. 29, 886 S.E.2d 364 (2023). The DHS takes issue with the subject matter jurisdiction language of this Syllabus Point.

We now take this opportunity to revisit and clarify our holding in Syllabus Point 3 of *In re B.V.* First, we must examine the precise language and intent of the Syllabus Point. As this Court has previously noted, a "'statement contained in a syllabus is to be read in the light of the opinion.' *Jones v. Jones*, 133 W. Va. 306, 310, 58 S.E.2d 857, 859 (1949)." *State v. Wallace*, 205 W. Va. 155, 159 n.4, 517 S.E.2d 20, 24 n.4 (1999). S*ee also State ex rel. State Farm Mut. Auto. Ins. Co. v. Canady*, 197 W. Va. 107, 110, 475 S.E.2d 107, 110 (1996) (stating "syllabus language cannot be viewed in a vacuum; it must be considered in the context of the entire opinion"). Syllabus Point 3 of *In re B.V.* explicitly references children in a "legal guardianship." Accordingly, the language of the Syllabus Point demonstrates that the Court was concerned with children living in guardianships away from the respondent parents and ensuring that the circuit court properly consider whether those children satisfy the statutory definition of an abused or neglected child prior

16

to moving to the dispositional phase. *See also In re K.M.*, No. 24-679, 2025 WL 2916259, at *2 (W. Va. Oct. 14, 2025) (memorandum decision) (stating that in *In re B.V.* "we clarified that the fact that at least one named child was *not* in the respondent parent's custody when the petition was filed meant that 'generalized findings applicable to all children named in the petition will not suffice.'" (citation omitted)).

Furthermore, this Court has subsequently applied this Syllabus Point in numerous matters, and, like *In re B.V.*, many of those cases involved situations where some children at issue were in a legal guardianship or resided with a non-abusing parent. *See, e.g.*, *In re B.H.*, No. 23-599, 2024 WL 4382118, at *2 (W. Va. Sept. 24, 2024) (memorandum decision) ("Here, the court made a generalized finding at adjudication that all of the children were abused and neglected, without specifically explaining how their health and welfare were harmed or threatened. Upon our review of the record, it is unclear whether J.C and E.C. were subject to the abusive and neglectful behavior alleged by the DHS's petition and subsequently proven at adjudication, as they may have been in the care of their nonabusing father."); *In re K.R.*, No. 23-8, 2024 WL 578667, at *3 (W. Va. Feb. 13, 2024) (memorandum decision) ("Here, although only S.F.-1 was in petitioner's care at the time the abuse and neglect petition was filed, the court found all four children to be abused and neglected, making generalized findings applicable to all children named in the petition. . . . Due to the jurisdictional nature of this issue, we must remand the matter for entry of an adjudicatory order complete with the requisite findings under the statute.").

17

However, the Court has, on occasion, applied this Syllabus Point more broadly as well. *See, e.g.*, *In re A.B.*, No. 23-301, 2024 WL 3986898, at *2 (W. Va. Aug. 27, 2024) (memorandum decision) ("The circuit court failed to provide factual findings to support its conclusion that the children were neglected or abused as defined in West Virginia Code § 49-1-201 and thus, lacked jurisdiction to proceed to disposition.").

Next, an examination of the statutory language regarding the adjudicatory phase and our case law applying that statutory language is necessary. West Virginia Code § 49-4-601 (eff. 2019), in relevant part, provides that the circuit court must hold an adjudicatory hearing and at the hearing's conclusion, the

> court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the respondent is abusing, neglecting, or, if applicable, a battered parent, all of which shall be incorporated into the order of the court.[18]

(Footnote added). Based upon this statutory language, this Court required that the circuit court decide whether the evidence supports a finding of abuse or neglect to justify the continuation of the matter:

> In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives under W. Va. Code [§ 49-4-604], it must hold a hearing under W. Va. Code [§ 49-4-601], and determine "whether such child is

---

[18] We note that West Virginia Code § 49-4-601 was amended in 2025; however, the amendments have no impact on this case or the statutory language at issue in this matter.

18

abused or neglected." *Such a finding is a prerequisite to further continuation of the case*.[19]

Syl. Pt. 1, *State v. T.C.*, 172 W. Va. 47, 303 S.E.2d 685 (1983) (emphasis added) (footnote added). In reaching this conclusion, the Court based its decision, in part,[20] on *In Re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973), "which established the constitutional protections afforded to parents in permanent child removal cases." *T.C.*, 172 W. Va. at 51, 303 S.E.2d at 689; *see also* Syl. Pt. 8, in part, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 ("Once a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody."). The Court acknowledged that "the [S]tate . . . [has] a right to intervene where parents are shown to be unfit to protect the interests of the children[.]" *T.C.*, 172 W. Va. at 51, 303 S.E.2d at 689. However, to intervene, the State must first make an "initial showing that there has been child abuse or neglect, which constitutes unfitness on the part of the parents to continue, either temporarily or permanently, in their custodial role." *Id.* The *T.C.* Court emphasized that the initial determination's primary purpose "is to protect the interest of all parties and to

---

[19] *T.C.* applied a previous version of the statute. That language is, however, substantially similar to the current statutory language.

[20] In reaching this determination, the Court also examined jurisprudence from other courts who had "spoken to this issue under statutes which are analogous to ours[.]" *T.C.*, 172 W. Va. at 50, 303 S.E.2d at 688 (collecting cases).

justify the *continued jurisdiction* under [our applicable abuse and neglect statutes]." *Id.* at 50, 303 S.E.2d at 688 (emphasis added).[21]

Following the Court's decision in *T.C.*, we have reiterated that "our statutes, cases, and rules instruct that a circuit court may not terminate parental rights at a § 49-4-604 disposition hearing without *first finding* that the parent abused or neglected the child in question at a § 49-4-601 adjudicatory hearing." *In re A.P.-1*, 241 W. Va. 688, 693, 827 S.E.2d 830, 835 (2019) (emphasis added).[22] In other words, a court must determine that a child is abused and/or neglected based upon the statutory definitions for the continuation of the abuse and neglect matter as to that child, i.e., proceeding to the dispositional phase.

---

[21] Aside from the primary purpose of justifying continuation of the matter to disposition, it is also "apparent that [adjudication] is an essential part of an abuse and neglect proceeding because before the conditions of abuse and/or neglect can be corrected, they first must be identified and documented—which is precisely the role played by an adjudication." *In re I.M.K.*, 240 W. Va. 679, 689, 815 S.E.2d 490, 500 (2018).

[22] *See also In re K.H.*, No. 18-0282, 2018 WL 6016722, at *5 (W. Va. Nov. 16, 2018) (memorandum decision) ("[W]e have long held that adjudication is a *prerequisite* for continuing to the disposition stage."); *In re M.P.*, No. 15-0118, 2015 WL 7628824, at *4 (W. Va. Nov. 23, 2015) (memorandum decision) ("[O]ur law is clear that a finding of abuse or neglect is a prerequisite to a final change in custody or other such disposition in abuse and neglect proceedings."); *In re T.W.*, 230 W. Va. 172, 179, 737 S.E.2d 69, 76 (2012) (stating that pursuant to the "mandates of the statutory scheme for the management of abuse and neglect cases," a finding of whether a child is abused or neglected is a "'*prerequisite* to further continuation of the case.'" (citation omitted)).

Our overstatement in *In re B.V.* notwithstanding, we clarify that this "continued jurisdiction" is not tantamount to subject matter jurisdiction in the traditional sense but rather reflects the court's statutory authority to proceed to the next steps in the statutory scheme. *See* W. Va. Code § 49-4-601. This approach is consistent with the Court's decisions regarding defective adjudications prior to *In re B.V.*[23] For example, in *In re G.M.*, No. 15-1015, 2016 WL 2979850, at \*3 (W. Va. May 23, 2016) (memorandum decision), the Court found that the circuit court's failure to properly adjudicate the petitioner as an abusing parent and the children as abused and neglected by the petitioner "constitute[d] a substantial disregard of the applicable rules and statutes such that vacation of the resulting dispositional order [wa]s warranted." In that case, the Court did not conclude that the lack of a proper adjudication deprived the circuit court of subject matter

---

[23] We acknowledge that in *In re A.P.-1*, 241 W. Va. 688, 694, 827 S.E.2d 830, 836 (2019), the Court found that the "circuit court lacked the continued jurisdiction to then terminate Petitioner's parental rights" by failing to find that the petitioner had abandoned his child as alleged in the abuse and neglect petition. *See also In re K.H.*, No. 18-0282, 2018 WL 6016722, at \*5 (W. Va. Nov. 16, 2018) (memorandum decision) ("In this case, the circuit court held an adjudicatory hearing where the DHHR alleged abandonment. After considering the evidence presented during that hearing, the court found that the petitioner had *not* abandoned his child and therefore was *not* an abusive or neglectful parent. In light of this ruling, it is clear that the circuit court lacked 'the continued jurisdiction' to subsequently terminate the petitioner's parental rights." (citation omitted)). While the Court used the term "jurisdiction" it did not discuss traditional subject matter jurisdiction, but rather noted that without a determination of abuse or neglect, the circuit court did not have the statutory authority to proceed to the dispositional phase: "DHHR's position—that a finding of abuse and neglect at an adjudicatory hearing is not a prerequisite to disposition—is untenable under the plain language of West Virginia Code §§ 49-4-601 and 49-4-604, as well as Syllabus Point 1 of our decision in *State v. T.C.*, decided more than thirty-five years ago." *A.P.-1*, 241 W. Va. at 694, 827 S.E.2d at 836.

jurisdiction, but rather that the statutory prerequisites were not met. *Id. See In re E.T.*, No. 17-1085, 2018 WL 1773180, at *3 (W. Va. Apr. 13, 2018) (memorandum decision) (concluding that the circuit court's failure to hold an adjudicatory hearing "constitute[d] a substantial disregard for the applicable rules and statutes such that vacation of the resulting dispositional order [wa]s warranted"); *In re George Glen B., Jr.*, 205 W. Va. 435, 444, 518 S.E.2d 863, 872 (1999) (reversing and remanding abuse and neglect matter because the circuit court's failure to hold certain hearings, including an adjudicatory hearing, "was not in compliance with pertinent statutes, rules, and case law").

Recently, the Montana Supreme Court reached a similar conclusion and found that the court's "recent jurisprudence . . . has clarified and emphasized the difference between legislative requirements and jurisdictional limits." *In re Z.N.-M.*, 538 P.3d 21, 32 (Mont. 2023). Specifically, it found that "[a] district court's failure to comply with statutory requirements for adjudication as youth in need of care has no effect on the court's jurisdiction to hear and determine a petition for termination of parental rights" and overruled past cases to the extent they held otherwise. *Id.* While we recognize the Montana statutory scheme is different than ours, it is nonetheless persuasive under these circumstances.

For the same reasons, the factual findings regarding the determination at adjudication are mandatory under the applicable statutes and rules, but the findings are not

22

required for a court to maintain or establish subject matter jurisdiction to consider the case. *See* W. Va. Code § 49-4-601; W. Va. R. P. Child Abuse & Neglect Proc. 27. As we have previously stated, "our precedents, whether set forth in an opinion or a memorandum decision, are not sacrosanct and will be reversed where warranted by the law[.]" *In re T.O.*, 238 W. Va. 455, 465, 796 S.E.2d 564, 574 (2017). Therefore, we now hold that specific findings of fact explaining how each child's health and welfare is being harmed or threatened by the abusive or neglectful conduct of the parties named in the petition are a statutory prerequisite for the circuit court to proceed to the dispositional phase, not a requirement for establishing or maintaining subject matter jurisdiction. To the extent that Syllabus Point 3 of *In re B.V.*, 248 W. Va. 29, 886 S.E.2d 364 (2023), holds otherwise, we expressly overrule that portion of Syllabus Point 3.[24]

---

[24] Prior to the Court's decision in *In re B.V.*, we held that,

> For a circuit court to have jurisdiction over a child in an abuse and neglect case, the child must be an "abused child" or a "neglected child" as those terms are defined in West Virginia Code § 49-1-201 (2018). Pursuant to West Virginia Code § 49-4-601(i) (2019), a circuit court's finding that a child is an "abused child" or a "neglected child" must be based upon the conditions existing at the time of the filing of the abuse and neglect petition.

Syl. Pt. 8, *In re C.S.*, 247 W. Va. 212, 875 S.E.2d 350 (2022). However, *In re C.S.* is distinguishable from *In re B.V.* In *In re C.S.*, this Court stated that "[a]n abuse and neglect petition may be filed '[i]f the department or a reputable person believes that a child is neglected or abused[.]'" *Id.* at 223, 875 S.E.2d at 361 (quoting W. Va. Code § 49-4-601(a)) (first alteration added, other alterations in original). We explained that under the facts of that case, one of the children "did not qualify as either an 'abused child' or a 'neglected child' as those terms are defined by statute" because the child had been living in a permanent legal guardianship for five years prior to the filing of the abuse and neglect petition *and the abuse and neglect petition contained no allegations relating to the harm*

Even in light of our holding regarding subject matter jurisdiction, to proceed to disposition, a circuit court must still comply with all applicable statutory and rule requirements. As stated above, West Virginia Code § 49-4-601, in relevant part, provides that at the conclusion of the mandatory adjudicatory hearing, the court must determine whether the child at issue is abused and/or neglected based upon the evidence presented and "shall make findings of fact and conclusions of law" regarding that determination. In addition, Rule 27 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings specifically requires the court to make findings of fact regarding whether the child is abused and/or neglected at the adjudicatory stage and, thereafter, enter an order setting forth those findings:

> At the conclusion of the adjudicatory hearing, the court shall make findings of fact and conclusions of law, in writing or on the record, as to whether the child is abused and/or neglected in accordance with W. Va. Code § 49-4-601(i). The court shall enter an order of adjudication, including findings of fact and conclusions of law, within ten (10) days of the conclusion of the hearing, and the parties and all other persons entitled to notice and the right to be heard shall be given notice of the entry of this order.

---

*or threat of harm to that child*. *Id.* at 224, 875 S.E.2d at 362. Therefore, there was no jurisdiction as to the child in the legal guardianship because the petition alleged no circumstances where the child could satisfy the statutory definition of an abused or neglected child. *Id.* Nevertheless, to the extent that *In re C.S.* has been read as stating that a defective adjudication deprives the circuit court of subject matter jurisdiction, it is also overruled.

Therefore, the circuit court must make the required determination of abuse and/or neglect and must make findings of fact to support that determination, including that the determination satisfies the statutory definition of abuse and/or neglect *and* is predicated on clear and convincing evidence presented to the court.

Here, Mother did not assert either below or in her initial briefing on appeal that the circuit court erred by failing to provide specific findings of fact regarding the adjudication. Because the circuit court's failure to make specific findings of fact does not deprive the circuit court of subject matter jurisdiction, it can be waived.[25] Furthermore, as we have stated, "'[g]enerally the failure to object constitutes a waiver of the right to raise the matter on appeal.'" *In re S.S.*, No. 15-0254, 2015 WL 6181419, at *3 (W. Va. Oct. 20, 2015) (memorandum decision) (alteration in original) (quoting *State v. Asbury*, 187 W. Va. 87, 91, 415 S.E.2d 891, 895 (1992) (per curiam)). Accordingly, because Mother failed to object to the lack of specific findings of fact at the adjudicatory stage of the proceedings, she has waived this issue on appeal.

However, even if an error is waived by a failure to object in an abuse and neglect case, it may still be subject to scrutiny by this Court if the circuit court's error

---

[25] "It is well established that the issue of subject matter jurisdiction can be raised at any time, even *sua sponte* by this Court." *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 239 W. Va. 338, 345, 801 S.E.2d 216, 223 (2017).

presented a substantial frustration or disregard for the applicable abuse and neglect statutes and rules:

> Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order . . . will be vacated and the case remanded for compliance with that process[.]

Syl. Pt. 5, in part, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001); *see also In re E.T.*, 2018 WL 1773180, at *3 (finding that, despite the petitioner failing to raise the issue on appeal, the adjudicatory defects were "obvious in the record" and that these "failure[s] constitute[] a substantial disregard for the applicable rules and statutes such that vacation of the resulting dispositional order [wa]s warranted"). In the case before us, at the conclusion of the multiple, contested adjudicatory hearings wherein many witnesses testified and documentary evidence was submitted into the record, the circuit court made the requisite finding that the children were abused and neglected:[26]

---

[26] The court's nunc pro tunc adjudicatory order likewise states:

> Thereupon the Court FOUND that based upon the testimony of witnesses and documentary evidence submitted, the respondent parents, . . . are abusing and neglectful parents, and the children [R.M.], [B.M.] and [H.M.] are abused and neglected children. The Court FOUND that this ruling is based upon the conditions existing at the time of the filing of the petition, and has been proven by clear and convincing evidence. The Court further FOUND the record establishes substantial evidence of neglect, and the medical records submitted by the respondent parents do not convince the Court otherwise. Accordingly, the Court CONCLUDED that the matter shall be set for disposition.

> All right, well, so today then would be the ruling on adjudication, and I find that based upon the evidence in this case these children have been abused and neglected under the meaning of the law. There is substantial evidence to that effect, and so that is my ruling. None of the records have convinced me any differently, and so that is my ruling, and I am going to schedule these matters for disposition.

The court specifically declared that this case was "one of the most severe cases . . . as far as the extreme neglect and abuse of these children and the conditions that were found at the time of the filing of the petition." Furthermore, the evidence presented below supports the circuit court's finding that each child was abused and neglected. The DHS presented three expert witnesses that collectively discussed the feeding and speech issues and other deficiencies that the three children have and that proper interventional services could have remedied or significantly improved the children's issues and that many of these deficiencies were caused by the children's environment. Consequently, despite the circuit court's failure to provide detailed factual findings regarding the determination of abuse and neglect at the adjudicatory phase of the proceedings below, we find that the applicable statutes and rules have not been substantially frustrated or disregarded.

---

To the extent that the circuit court may have erred by failing to find that Mother was an abusing parent prior to the dispositional hearing, reversal is not required under the facts of this case. Mother did not object to the absence of such a finding below and has not raised as an assignment of error on appeal. Furthermore, the record on appeal supports the circuit court's finding that the children were abused and neglected by Mother and demonstrates that Mother knew exactly why the circuit court adjudicated the children as abused and neglected by her. The applicable rules and statutes have not been substantially frustrated here. *See* Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).

27

### B. Post-Adjudicatory Improvement Period

Having found that the circuit court had the authority to proceed to disposition, we now address Mother's sole assignment of error: that the circuit court erred by terminating her parental rights without first granting her a post-adjudicatory improvement period. There is no merit to this contention.

West Virginia Code § 49-4-610(2)(B) (eff. 2015) permits a circuit court to grant an improvement period when a parent "demonstrates, by clear and convincing evidence, that [she] is likely to fully participate[.]" Circuit courts have discretion to deny an improvement period when improvement is unlikely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002) (per curiam). Parents are not "unconditionally entitled to an improvement period" and the "burden of proof falls upon the parent requesting an improvement period." *In re Charity H.*, 215 W. Va. 208, 215, 216, 599 S.E.2d 631, 638-39 (2004) (per curiam). Moreover, "courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]" Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

While there is some evidence that Mother participated in services throughout the proceeding and had several clean drug tests, she ultimately failed to demonstrate that she should have been granted an opportunity to remedy the circumstances that led to the

initial petition being filed. Mother, despite various clean drugs tests, continued to have at the very least intermittent positive results for methamphetamine and THC during the proceedings, failed to acknowledge the abuse and neglect she inflicted upon the children, and consistently denied the poor conditions of the home. As this Court has repeatedly stated, "Failure to acknowledge the existence of the problem . . . results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense." *W. Va. Dep't of Health & Hum. Res. ex rel. Wright v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996). Therefore, the circuit court correctly denied Mother's motion for an improvement period.

## IV.

## CONCLUSION

For the reasons set forth above, the May 17, 2024 order of the Circuit Court of Kanawha County that terminated Mother's parental rights is affirmed.

Affirmed.